UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

STEVEN KALCH,

    Plaintiff,

v.                                              Case No: 6:16-cv-1529-Orl-40KRS

RAYTHEON TECHNICAL SERVICES COMPANY, LLC and RAYTHEON COMPANY,

    Defendants.
_____

## ORDER

This cause comes before the Court without oral argument on Defendant Raytheon Company's Amended Motion for Final Summary Judgment (Doc. 78), filed May 16, 2017. The parties have completed their briefing and the Court is otherwise fully advised on the premises. Upon consideration and review of the record as cited by the parties in their respective briefs, the Court will grant Defendant's Amended Motion for Final Summary Judgment.

## I. BACKGROUND

### A. Facts[1]

Defendant, Raytheon Company ("Raytheon"), is a U.S. defense contractor specializing in military, homeland security, and other governmental markets. Defendant, Raytheon Technical Services Company, LLC ("RTSC"), was a subsidiary of Raytheon until RTSC merged into Raytheon on April 11, 2015. While operating as Raytheon's subsidiary,

---

[1] Unless otherwise indicated, the Court gathers this account of the facts from the parties' Joint Stipulation of Agreed Material Facts.

RTSC provided technical and scientific solutions for defense, federal, homeland security, and commercial customers worldwide.

From April 23, 2012 through January 17, 2014, RTSC employed Plaintiff, Steven Kalch, as a military contractor. Pertinent to this case, on May 26, 2012, RTSC assigned Kalch to a Senior Training and Development Specialist position in support of a contract RTSC had with the U.S. Army in Afghanistan. In this position, Kalch was responsible for training commandos within the Afghan National Army Special Operations Command.

Kalch arrived in Afghanistan in June 2012. Shortly after his arrival, Kalch started noticing what he believed to be fraud, waste, and abuse by other RTSC and Raytheon contractors. (Doc. 1, ¶ 21). Most notably, Kalch claims that he observed contractors not performing the work they were hired to perform, overbilling the Army for the work they did perform, and otherwise violating the terms of the Army's contract. (*Id.* ¶¶ 22–26). Kalch repeatedly raised these issues to his on-site supervisor, Tremayne Smith, and attempted to persuade Smith to stop the misconduct, but Smith ignored Kalch's concerns. (Doc. 82-2, 118:1–25, 122:2–23). On December 18, 2013, Kalch recorded one of his conversations with Smith, where he again raised his concerns regarding potential fraud against the Army. (Doc. 82-2, 118:5–14).

During his tenure in Afghanistan, Kalch himself was the subject of numerous complaints. Kalch's coworkers described him as arrogant, confrontational, rude, and hostile, and they resented Kalch's accusations that they were bilking the Army. (Docs. 77-2, 77-4). During a routine site visit in October 2013, Smith reported his concerns about Kalch's behavior to Raytheon's Deputy Program Manager, Vincent Hosch. (Doc. 77-17, 16:1–15, 23:12–24:7). Hosch advised Smith to document Kalch's performance issues and to intervene as the team leader to correct Kalch's behavior. (*Id.* at 23:20–24:1). However,

conflicts between Kalch and his coworkers eventually escalated to the point that Hosch was called to investigate the team's working environment later that year. (Doc. 77-17, 31:8–33:17; Doc. 77-18, 24:22–25:23). Hosch completed his investigation on December 18 and 19, 2013, and he submitted written findings shortly thereafter. (Doc. 77-2). Hosch ultimately determined that Kalch created a hostile work environment, committed a security violation by recording his conversation with Smith on December 18th, and that Smith failed in his leadership of the team. (*Id.*).

After his recorded conversation with Kalch on December 18th, Smith met with Raytheon's Army contact, Chief Warrant Officer Peter Morris ("Warrant Officer Morris"). (Doc. 82-3, 60:6–16). During this meeting, Smith advised Warrant Officer Morris about his recorded conversation with Kalch and Kalch's continued behavioral problems. (*Id.* at 60:20–25; Doc. 77-15, 62:13–63:10). When Warrant Officer Morris asked Smith what the Army could do about the situation, Smith advised that the Army could submit a loss-of-confidence memorandum to Raytheon, following which Raytheon would pursue the matter through its human resources department. (Doc. 77-15, 63:11–64:2). On December 22, 2013, after completing his own investigation, Warrant Officer Morris submitted a loss-of-confidence memorandum to Raytheon, citing Kalch's untrustworthy behavior, lack of judgment, and inability to work with the RTSC team. (*Id.* at 64:3–64:18; Doc. 77-9). Warrant Officer Morris additionally recommended that Kalch be immediately removed from his position. (*Id.*). On December 24, 2013, another contracting officer from the Army submitted a second loss-of-confidence memorandum, again citing Kalch's untrustworthy behavior and lack of judgment. (Doc. 77-8). In this second memorandum, the Army directed RTSC to take immediate action to rectify the situation. (*Id.*).

After receiving the Army's loss-of-confidence memoranda, Raytheon removed Kalch from the field and returned him to the United States, following which Raytheon conducted its own investigation. (Doc. 77-19, 121:21–123:1; Doc. 82-5, 101:1–102:21). Raytheon's Human Resources Generalist, Christina Stoll, ultimately determined that Kalch created a hostile work environment in Afghanistan and violated a Raytheon security policy prohibiting the use of recording devices in the field. (Doc. 77-7). Based on these findings, Raytheon's Vice President of Human Resources, Paul Clegg, terminated Kalch effective January 17, 2014. (Doc. 77-20, 18:1–19:13).

### B. Procedural History

On April 5, 2016, Kalch filed a two-count Complaint against Raytheon and RTSC in the United States District Court for the Western District of Missouri. In Count I, Kalch alleges a claim for retaliation under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733. In Count II, Kalch alleges a claim for wrongful discharge under Missouri state law. On August 18, 2016, the case was transferred to this Court pursuant to 28 U.S.C. § 1404(a). Raytheon now moves for summary judgment on both of Kalch's claims.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock*

*Café Int'l (USA), Inc.*, No. 16-17450, 2017 WL 3207125, at *2 (11th Cir. July 28, 2017) (per curiam) (holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). In determining whether a genuine dispute of material fact exists, the court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III. DISCUSSION

### A. Count I: Retaliation Under the False Claims Act

Raytheon first moves for summary judgment on Kalch's FCA retaliation claim in Count I. Raytheon contends that Kalch cannot establish a prima facie case of retaliation under the FCA or, in the alternative, that Kalch cannot prove that Raytheon's proffered legitimate reasons for terminating him were merely a pretext to engage in retaliation.

The FCA "has been the federal government's primary tool for combatting fraud perpetrated against it for over 150 years." *Arthurs v. Global TPA LLC*, 208 F. Supp. 3d 1260, 1263–64 (M.D. Fla. 2015). Because employees naturally became a major source of information about fraud committed against the government, Congress amended the FCA in 1986 to protect employees who investigate and report fraud from the retaliatory acts of their employers. *Id.* at 1265. To that end, the FCA makes it illegal for an employer to retaliate against any employee, contractor, or agent for engaging in whistleblowing activities. The FCA's anti-retaliation provision specifically states as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To prevail on a claim of FCA retaliation, the plaintiff must prove three elements: (1) he engaged in protected conduct, (2) the defendant took adverse action against his employment, and (3) the defendant took the adverse action because of his protected conduct. *See Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 791 (11th Cir. 2015)

(per curiam); *Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005) (per curiam). Raytheon contends that Kalch cannot prove the first and third elements.

The Court finds that Kalch engaged in conduct protected by the FCA. In 2009, Congress expanded the FCA's anti-retaliation provision to protect not just whistleblowing conduct taken in furtherance of potential litigation, but also whistleblowing conduct taken to stop a possible violation of the FCA where no litigation is contemplated. *See Arthurs*, 208 F. Supp. 3d at 1264–66 (comparing the 2006 and 2012 versions of the FCA's anti-retaliation provision and explaining that § 3730(h)(1) now protects certain non-litigation conduct, such as reporting potential malfeasance to supervisors); *Bell v. Dean*, No. 2:09-CV-1082-WKW [WO], 2010 WL 2976752, at *1 (M.D. Ala. July 27, 2010) (observing that a connection to actual or threatened litigation is no longer required under the FCA's anti-retaliation provision). As a result, Kalch engaged in protected conduct when he confronted his supervisor, Tremayne Smith, about what he believed were fraudulent billing practices against the Army and attempted to motivate Smith to take action to stop the purported fraud.

However, the Court finds that Kalch fails to demonstrate that Raytheon took adverse action against him because of his protected conduct. To establish causation under § 3730(h)(1), the plaintiff must show that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct. *See Reynolds*, 620 F. App'x at 792. It is not enough for other employees, supervisors, or members of the employer's management to know about the plaintiff's protected conduct where these individuals have no decision-making authority. *See id.* (finding no causation where the only people who knew about the plaintiff's protected conduct were a supervisor and another employee, neither of whom had the power to take adverse action against the plaintiff's employment).

In this case, Raytheon's Vice President of Human Resources, Paul Clegg, terminated Kalch's employment; however, Kalch cites no evidence indicating that Clegg was aware of Kalch's protected conduct when he made the decision. The most Kalch points to is that his on-site supervisor, Tremayne Smith, and Raytheon's Deputy Program Manager, Vincent Hosch, knew of his whistleblowing activities. But neither of these individuals had the power to terminate Kalch, and Kalch does not cite evidence that either Smith or Hosch notified Clegg about Kalch's protected conduct. Based on this lack of evidence, it cannot be said that Clegg terminated Kalch "because of" his protected conduct.

To the extent Kalch argues that Clegg's decision was influenced by information or recommendations provided to him by other Raytheon employees who secretly held retaliatory motives, the Eleventh Circuit recently signaled that this type of "cat's paw" theory of liability does not apply to statutory provisions like § 3730(h)(1), which require "but-for" causation:

> This Court has not yet applied the cat's paw theory in an FCA retaliation case. Furthermore, this Court has indicated that while the theory may be appropriate in cases in which the plaintiff is required to prove only that the protected characteristic was a motivating factor, such as in Title VII disparate treatment claims, the theory is inappropriate when the statute requires "but-for" causation.

*Reynolds*, 620 F. App'x at 792. Indeed, in *Sims v. MVM, Inc.*, 704 F.3d 1327 (11th Cir. 2013), the Eleventh Circuit explicitly held that "cat's paw" liability does not apply to retaliation claims brought under the Age Discrimination in Employment Act, which utilizes the same "because of" causation standard as the FCA. *See id.* at 1335–36. Accordingly, Kalch cannot survive summary judgment without citing evidence that Clegg, as the decision-maker who terminated Kalch's employment, was aware of Kalch's protected conduct. Since Kalch failed to do so, the Court will grant summary judgment in favor of Raytheon on Count I.

### B. Count II: Wrongful Discharge Under Missouri Law

Raytheon next moves for summary judgment on Kalch's Missouri wrongful discharge claim in Count II. Raytheon raises two arguments: first, that Missouri law does not apply to this case, and second, even if Missouri law does apply, Kalch cannot prove his claim.

With respect to its first argument, Raytheon asserts that the application of Missouri law is improper because this Court sits in Florida. However, Raytheon forgets that this case was transferred from a district court in Missouri pursuant to 28 U.S.C. § 1404(a). When a case is transferred under this provision, "[t]he transferee court is 'obligated to apply the state law that would have been applied if there had been no change of venue.'" *James Ventures, L.P. ex rel. Alpert v. Timco Aviation Servs., Inc.*, 315 F. App'x 885, 888 (11th Cir. 2009) (per curiam) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 641 (1964)). Because the Missouri district court would have applied Missouri law to Kalch's Missouri wrongful discharge claim had this case not been transferred, this Court will do the same.

With respect to Raytheon's second argument, Missouri is an at-will employment state, meaning that, absent an employment contract providing to the contrary, an employer may terminate an employee for any reason or for no reason at all. *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 345 (Mo. 2010) (en banc). Notwithstanding, Missouri also recognizes a public policy exception to this at-will employment rule. *Id.* at 346. Commonly referred to as the "wrongful discharge doctrine," "[a]n at-will employee may not be terminated for refusing to perform an illegal act or reporting wrongdoing or violations of law to superiors or third parties."[2] *Id.*

---

[2] The Court notes that Missouri's wrongful discharge doctrine applies equally to contract employees like Kalch. *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 103 (Mo. 2010) (en banc).

As part of proving a claim for wrongful discharge, a plaintiff must demonstrate that he either refused to perform an illegal act, refused to act in a manner contrary to public policy, or reported wrongdoing or violations of law to superiors or third parties. *Id.*; *see also Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 103 (Mo. 2010) (en banc). Raytheon contends that the only conduct at issue in this case is the third category—reporting wrongdoing or violations of law to superiors or third parties—and that Kalch fails to show that he engaged in such conduct.

When a plaintiff proceeds under the theory that he was discharged due to his whistleblowing activities, the plaintiff "must show that he 'reported to superiors or to public authorities *serious* misconduct that constitutes a violation of the law and of . . . *well established* and *clearly mandated* public policy.'" *Margiotta*, 315 S.W.3d at 347 (quoting *Lynch v. Blank Baer & Bowey Krimki, Inc.*, 901 S.W.2d 147, 150 (Mo. Ct. App. 1995)). It is not enough for the plaintiff to make vague references to the violation of a law; rather, the plaintiff must articulate that actual misconduct occurred and that the misconduct violated an identifiable statute, regulation, constitutional provision, or public policy. *See id.* at 347.

Raytheon carries its burden on summary judgment of showing that Kalch cannot establish that actual misconduct occurred that violated an identifiable law. The Department of Defense ultimately investigated Kalch's accusations of billing fraud against the Army and found that "it was not reasonable for [Kalch] to believe that Raytheon Company employees did not perform their jobs as prescribed in the contract." (Doc. 77-12, p. 1). Raytheon additionally points to a complete lack of evidence in the record demonstrating an actual violation of law. In response, Kalch does not attempt to rebut Raytheon's evidentiary showing. The Court will therefore grant summary judgment in favor of Raytheon on Count II as well.

## IV. CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Raytheon Company's Amended Motion for Final Summary Judgment (Doc. 78) is **GRANTED**. Defendant, Raytheon Company, is entitled to summary judgment on Plaintiff's Complaint.

2. The Clerk of Court is **DIRECTED** to enter the following Judgment:

   Judgment is entered in favor of Defendant, Raytheon Company, and against Plaintiff, Steven Kalch. Plaintiff shall take nothing from Defendant.

3. Defendant Raytheon Company's Motion in Limine (Doc. 104) is **DENIED AS MOOT**.

4. Since Defendant, Raytheon Technical Services Company, LLC, did not join in Raytheon Company's Motion for Summary Judgment, this action remains pending against Raytheon Technical Services Company, LLC.[3]

**DONE AND ORDERED** in Orlando, Florida on August 8, 2017.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

---

[3] Although it appears that RTSC might not have the capacity to be sued due to its merger with Raytheon in April 2015, no party has raised this issue to the Court. *See* Fed. R. Civ. P. 17(b)(3).